IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| PAUL PARSHALL, Individually and On Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>ROYAL BANCSHARES OF PENNSYLVANIA, INC., ROBERT TABAS, KEVIN TYLUS, EDWARD F. BRADLEY, WAYNE R. HUEY, JR., MICHAEL J. PIRACCI, MURRAY STEMPEL III, LINDA TABAS STEMPEL, GERARD M. THOMCHICK, HOWARD WURZAK, and BRYN MAWR BANK CORPORATION,<br><br>Defendants. | Case No. _____<br><br>JURY TRIAL DEMANDED<br><br>CLASS ACTION |

## COMPLAINT FOR VIOLATION OF THE SECURITIES EXCHANGE ACT OF 1934

Plaintiff, by his undersigned attorneys, for this complaint against defendants, alleges upon personal knowledge with respect to himself, and upon information and belief based upon, *inter alia*, the investigation of counsel as to all other allegations herein, as follows:

### NATURE OF THE ACTION

1. This action stems from a proposed transaction announced on January 31, 2017 (the "Proposed Transaction"), pursuant to which Royal Bancshares of Pennsylvania, Inc. ("Royal Bancshares," "RBPI," or the "Company") will be acquired by Bryn Mawr Bank Corporation ("Bryn Mawr" or "BMBC").

2. On January 30, 2017, the Royal Bancshares Board of Directors (the "Board" or the "Individual Defendants") caused the Company to enter into a definitive agreement and plan of merger ("Merger Agreement") with Bryn Mawr. Pursuant to the terms of the Merger Agreement, shareholders of RBPI will receive 0.1025 shares of Bryn Mawr common stock for

each share of RBPI Class A common stock they own, and 0.1179 shares of Bryn Mawr common stock for each share of RBPI Class B common stock they own (the "Proposed Transaction"). After completion of the Proposed Transaction, it is expected that RBPI shareholders, as a group, will own only approximately 15.5% of BMBC.

3. On January 30, 2017, the last trading day before public announcement of the Proposed Transaction, the 0.1025 exchange ratio represented approximately $4.14 in value for each share of RBPI Class A stock and the 0.1179 exchange ratio represented approximately $4.76 in value for each share of RBPI Class B stock for an aggregate transaction value of approximately $125.6 million. However, since that time, Bryn Mawr's stock price has dropped, thus resulting in a lower implied merger consideration. For example, on March 22, 2017, the implied merger consideration for RBPI's Class A stock was only $3.84 per share and only $4.42 per share for RBPI's Class B stock. The Board did not negotiate for a collar that would protect RBPI's stockholders from this foreseeable decline in BMBC's stock price.

4. Upon consummation of the Proposed Transaction, Royal Bancshares will merge with and into Bryn Mawr, with Bryn Mawr continuing as the surviving corporation. Additionally, immediately following the merger, Royal Bancshares' wholly-owned bank subsidiary, Royal Bank America ("Royal Bank"), will merge with Bryn Mawr's wholly-owned bank subsidiary, The Bryn Mawr Trust Company ("BMTC"), with BMTC as the surviving bank.

5. On March 29, 2017, defendants filed a Form S-4 Registration Statement (the "Registration Statement") with the United States Securities and Exchange Commission ("SEC") in connection with the Proposed Transaction. The Registration Statement recommends that RBPI stockholders vote in favor of the Proposed Transaction, but omits or misrepresents material information that is preventing RBPI's stockholders from making a fully informed decision with

respect to the Proposed Transaction.

6. The Registration Statement is false and misleading in that it fails to provide adequate disclosure of all material information related to the Proposed Transaction. Accordingly, plaintiff alleges herein that defendants violated Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 (the "1934 Act") in connection with the Registration Statement.

## JURISDICTION AND VENUE

7. This Court has jurisdiction over the claims asserted herein pursuant to Section 27 of the 1934 Act because the claims asserted herein arise under Sections 14(a) and 20(a) of the 1934 Act and Rule 14a-9.

8. This Court has jurisdiction over defendants because each defendant is either a corporation that conducts business in and maintains operations within this District, or is an individual with sufficient minimum contacts with this District so as to make the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

9. Venue is proper under 28 U.S.C. § 1391(b) because a substantial portion of the transactions and wrongs complained of herein occurred in this District.

## THE PARTIES

10. Plaintiff is, and has been continuously throughout all times relevant hereto, the owner of Royal Bancshares common stock.

11. Defendant Royal Bancshares is a Pennsylvania corporation and maintains its principal executive offices at One Bala Plaza Suite 522, 231 St. Asaph's Road, Bala Cynwyd, Pennsylvania 19004. The Company operates as the bank holding company for Royal Bank that provides a range of financial and banking products and services. Royal Bancshares' common stock is traded on the NasdaqGM under the ticker symbol "RBPAA."

12. Defendant Robert Tabas ("Tabas") has served as a Royal Bancshares director since 1988 and is Chairman of the Board. According to the Company's Form DEF 14A filed with the SEC on March 17, 2016 (the "2016 DEF 14A"), Tabas is a member of the Compensation Committee and the Nominating and Governance Committee.

13. Defendant Kevin Tylus ("Tylus") has served as a Royal Bancshares director since 2013 and is the Company's President and Chief Executive Officer ("CEO").

14. Defendant Edward F. Bradley ("Bradley") has served as a Royal Bancshares director since 2008. According to the 2016 DEF 14A, Bradley is Chair of the Audit Committee and Chair of the Nominating and Governance Committee.

15. Defendant Wayne R. Huey, Jr. ("Huey") has served as a Royal Bancshares director since 2011.

16. Defendant Michael J. Piracci ("Piracci") has served as a Royal Bancshares director since 2010. According to the 2016 DEF 14A, Piracci is a member of the Audit Committee and the Nominating and Governance Committee.

17. Defendant Murray Stempel III ("M. Stempel") has served as a Royal Bancshares director since 1997. According to the 2016 DEF 14A, M. Stempel is a member of the Nominating and Governance Committee.

18. Defendant Linda Tabas Stempel ("L. Stempel") has served as a Royal Bancshares director since 2003. According to the 2016 DEF 14A, L. Stempel is a member of the Compensation Committee.

19. Defendant Gerard M. Thomchick ("Thomchick") has served as a Royal Bancshares director since 2011. According to the 2016 DEF 14A, Thomchick is a member of the Audit Committee and the Compensation Committee.

20. Defendant Howard Wurzak ("Wurzak") has served as a Royal Bancshares director since 1992.

21. The defendants identified in paragraphs 12 through 20 are collectively referred to herein as the "Individual Defendants."

22. Defendant Bryn Mawr is a Pennsylvania corporation with its corporate headquarters located at 801 Lancaster Avenue, Bryn Mawr, Pennsylvania 19010.

## CLASS ACTION ALLEGATIONS

23. Plaintiff brings this action on his own behalf and as a class action on behalf of all holders of Royal Bancshares stock (the "Class"). Excluded from the Class are defendants herein and any person, firm, trust, corporation, or other entity related to or affiliated with any defendant.

24. This action is properly maintainable as a class action.

25. The Class is so numerous that joinder of all members is impracticable. As of January 30, 2017, there were approximately 28,244,055 Class A shares and 1,924,629 Class B shares of Royal Bancshares common stock outstanding, held by hundreds, if not thousands, of individuals and entities scattered throughout the country.

26. Questions of law and fact are common to the Class, including, among others: (i) whether defendants violated the 1934 Act; and (ii) whether defendants will irreparably harm plaintiff and the other members of the Class if defendants' conduct complained of herein continues.

27. Plaintiff is committed to prosecuting this action and has retained competent counsel experienced in litigation of this nature. Plaintiff's claims are typical of the claims of the other members of the Class and plaintiff has the same interests as the other members of the Class. Accordingly, plaintiff is an adequate representative of the Class and will fairly and

adequately protect the interests of the Class.

28. The prosecution of separate actions by individual members of the Class would create the risk of inconsistent or varying adjudications that would establish incompatible standards of conduct for defendants, or adjudications that would, as a practical matter, be dispositive of the interests of individual members of the Class who are not parties to the adjudications or would substantially impair or impede those non-party Class members' ability to protect their interests.

29. Defendants have acted, or refused to act, on grounds generally applicable to the Class as a whole, and are causing injury to the entire Class. Therefore, final injunctive relief on behalf of the Class is appropriate.

## SUBSTANTIVE ALLEGATIONS

### Background of the Company and the Proposed Transaction

30. Royal Bancshares is the parent company of Royal Bank, which is headquartered in Narberth, Pennsylvania.

31. Royal Bank serves growing small and middle market businesses, commercial real estate investors, consumers, and depositors principally in Montgomery, Delaware, Chester, Bucks, Philadelphia, and Berks counties in Pennsylvania, central and southern New Jersey, and Delaware.

32. Established in 1963, Royal Bank provides an array of financial products and services through a comprehensive suite of cash management services and thirteen branches and two loan production offices.

33. On January 30, 2017, Royal Bancshares issued a press release wherein it reported its fourth quarter and full year 2016 results.

34. The Company reported that, at December 31, 2016, total assets were $832.5 million and grew $21.1 million, or 2.6%, from $811.4 million at September 30, 2016, and increased $44.2 million, or 5.6%, from $788.3 million at December 31, 2015.

35. Total loans were $602.0 million at December 31, 2016, an increase of $26.2 million, or 4.5%, from $575.8 million at September 30, 2016. In 2016, total loans grew $102.9 million, or 20.6%, from $499.1 million at December 31, 2015.

36. Total deposits were $629.5 million at December 31, 2016 and increased $37.3 million, or 6.3%, from $592.2 million at September 30, 2016. In 2016, total deposits increased $51.6 million, or 8.9%, from $577.9 million at December 31, 2015.

37. Net interest income increased $477 thousand, or 7.7%, from $6.2 million for the three months ended December 31, 2015 to $6.6 million for the three months ended December 31, 2016. Net interest income increased $2.6 million, or 11.0%, from $23.5 million for the year ended December 31, 2015 to $26.1 million for the year ended December 31, 2016.

38. Non-interest income was $4.3 million for the year ended December 31, 2016 and grew $1.2 million from $3.1 million for the year ended December 31, 2015.

39. With respect to the financial results, Individual Defendant Tylus commented:

> Quality loan growth and expense discipline drove our increase in earnings for 2016. Throughout the year, as we received regulatory approval, we repurchased all of the remaining Series A Preferred stock ("TARP"). We have fully retired the $30.4 million in original principal and avoid future dividends at a rate of 9%. During 2016, to meet the needs of our growing customer base, we broadened our online customer technologies, implemented enhancements to our website, and added residential mortgages to our suite of products. Recently, we completed extensive renovations of our Narberth retail location, which brings a modern experience to our customers.

40. Despite the Company's prospects for future growth and success, the Company entered into the Merger Agreement, pursuant to which shareholders of Royal Bancshares will

receive 0.1025 shares of Bryn Mawr common stock per Class A share and 0.1179 shares of Bryn Mawr common stock per Class B share.

*The Process Leading to the Proposed Transaction*

41. On June 22, 2016, RBPI's President and CEO, Individual Defendant Tylus, received a phone call from the President and CEO of another publicly traded regional financial institution holding company ("Company A") who expressed interest in the possibility of exploring a potential business combination between RBPI and Company A.

42. On July 28, 2016, the President and CEO of BMBC met with Tylus and inquired whether RBPI would have any interest in a possible business combination transaction with BMBC.

43. On October 4, 2016, the President and CEO of Company A met with Tylus and again inquired whether RBPI would have any interest in considering a potential business combination with Company A.

44. According to the Registration Statement, in September 2016, "RBPI authorized its financial advisor, [Sandler O'Neill & Partners, L.P. ("Sandler O'Neill")], to formally contact each of BMBC and Company A to determine whether they might have interest in a business combination with RBPI and, if so, the preliminary price range and other material terms for such interest." Although the Registration Statement indicates that RBPI selected Sandler O'Neill as its financial advisor based on, among other factors, Sandler O'Neill's "familiarity with the business and operations of RBPI," the Registration Statement fails to disclose whether Sandler O'Neill has performed any services for RBPI in the past (and not just the past two years), as well as the compensation earned for those services, if any.

45. Further, the Registration Statement states that: "Sandler O'Neill provided certain

8

investment banking services to BMBC and received compensation for such services. Most recently, Sandler O'Neill acted as placement agent to BMBC in connection with its offer and sale of $30 million of subordinated notes on August 6, 2015." The Registration Statement, however, fails to disclose the amount of compensation that Sandler O'Neill was paid in connection with that past service. It also fails to disclose what other services Sandler O'Neill provided to BMBC in the past, as well as when Sandler O'Neill performed those services and the compensation earned for those services. Additionally, the Registration Statement states that "Sandler O'Neill has advised the RBPI board of directors that it may provide, and receive compensation for, investment banking services to BMBC in the future, including during the pendency of the merger." The Registration Statement, however, fails to provide full disclosure of the nature, timing, and compensation to be earned in connection with any contemplated services that Sandler O'Neill might provide to "BMBC in the future, including during the pendency of the merger."

46. Representatives of Sandler O'Neill requested from BMBC and Company A that written indication of interest letters be received prior to the date of a previously scheduled strategic planning meeting of RBPI's Board on November 18, 2016.

47. According to the Registration Statement, each of BMBC and Company A executed "standard nondisclosure agreements" in September 2016. The Registration Statement, however, fails to disclose the terms of those confidentiality agreements, including whether they contained standstill and "don't ask, don't waive" provisions that are preventing Company A from submitting a superior offer to acquire the Company.

48. In the period between September 2016 and January 2016, Tylus had various telephone calls with the President and CEO of each of BMBC and Company A regarding due

diligence and strategic matters, and a data site was populated with materials for preliminary due diligence in October 2016.

49. On or about November 15, 2016, each of BMBC and Company A submitted a written preliminary indication of interest letter to the Company, but the Registration Statement fails to disclose the terms of those indications of interest.

50. On November 18, 2016, the Board met and "received a presentation from an experienced banking industry consultant and advisor." According to the Registration Statement, the presentation included, among other things, "a review of RBPI's financial performance, a peer group analysis, a financial services industry overview with an emphasis on emerging trends, a review of the markets in which RPBI operates, and a review of potential core strategies." The Registration Statement, however, fails to disclose the identity of that "experienced banking industry consultant and advisor," the reason it was hired, and the amount of compensation it was paid in connection with its engagement. Also at the meeting, Sandler O'Neill addressed with the Board the possibility of a business combination with other financial institutions, and their potential interest based on various factors, but the Board apparently declined to reach out to any other parties to attempt to maximize stockholder value.

51. On January 10, 2017, BMBC submitted a revised indication of interest letter and Company A declined to submit an indication of interest for reasons undisclosed in the Registration Statement. BMBC's revised indication of interest set forth a fixed exchange ratio of 0.1025x for RBPI's Class A shares and a fixed exchange ratio of 0.1179x for Class B shares, which equated to a then current implied price of $4.27 per share. BMBC also agreed to appoint one of RBPI's directors to the board of directors of BMBC and BMTC at closing, while maintaining an advisory board for all of RBPI's remaining directors. The Registration Statement

fails to disclose whether BMBC's revised indication of interest contained a request for exclusivity.

52. Remarkably, following one Board meeting held on January 12, 2017 and without ever countering BMBC's offer, the Board authorized Tylus to execute and return the January 10, 2017 BMBC indication of interest letter, and to begin negotiation of a merger agreement and ancillary documents.

53. According to the Registration Statement, "in mid-January 2017, during a strategic discussion regarding the post-merger combined company, BMBC's Chief Executive Officer introduced the concept of Mr. Tylus becoming an employee of BMT following the merger to assist BMT in the integration process with Royal Bank's employees, and to provide BMT with knowledge and strategic leadership in certain new markets."

54. On January 30, 2017, the Board met, with Tylus in attendance and participating, to consider the proposed Merger Agreement and certain ancillary documents, which had been substantially negotiated at that point. At the meeting, representatives of Sandler O'Neill made a presentation of its valuation analyses to the Board, but the Registration Statement fails to disclose a fair summary of those analyses, including their key inputs and other material information. Following its presentation, Sandler O'Neill opined that the merger consideration was fair from a financial point of view.

55. According to the Registration Statement, also at the meeting, "[r]epresentatives of RBC Capital Markets, LLC, which was also engaged to provide financial advisory services to RBPI in connection with the transaction, also made a presentation at the meeting with respect the proposed merger, but did not provide a fairness opinion." The Registration Statement fails to disclose the reason the Board deemed it necessary to engage RBC Capital Markets, LLC

("RBC") as a second financial advisor, including whether it was due to any perceived conflicts of interest. Further, the Registration Statement fails to disclose the nature of RBC's engagement, when it was engaged, and the amount of compensation RBC earned in connection with its engagement. Additionally, the Registration Statement fails to disclose whether RBC has provided any services to RBPI and BMBC in the past, as well as the timing and amount of compensation earned for those services. Finally, the Registration Statement fails to disclose a fair summary of the analyses that RBC performed and presented to the Board.

56. Following these presentations, the Board voted to approve the Merger Agreement. Also on that day, Tylus not surprisingly accepted BMTC's offer of post-merger employment, and signed BMTC's employment agreement. Following the execution of the Merger Agreement, BMBC and RBPI issued a joint press release announcing the Proposed Transaction prior to the opening of the market on January 31, 2017.

*The Preclusive Terms of the Merger Agreement*

57. To the detriment of the Company's stockholders, the terms of the Merger Agreement substantially favor Bryn Mawr and are calculated to unreasonably dissuade potential suitors from making competing offers.

58. For example, the Individual Defendants have all but ensured that another entity will not emerge with a competing proposal by agreeing to a "No Solicitation" provision in the Merger Agreement that prohibits the Individual Defendants from soliciting alternative proposals and severely constrains their ability to communicate and negotiate with potential buyers who wish to submit or have submitted unsolicited alternative proposals. Section 6.10.1 of the Merger Agreement states, in relevant part:

> RBPI shall not, and shall cause its Subsidiaries and its and their respective officers, directors, employees, investment bankers, financial advisors, attorneys,

accountants, consultants, affiliates and other agents (collectively, "**Representatives**") not to, directly or indirectly, (a) initiate, solicit, induce or knowingly encourage, or take any action to facilitate the making of, any inquiry, offer or proposal which constitutes, or could reasonably be expected to lead to, an Acquisition Proposal; (b) participate in any discussions or negotiations regarding any Acquisition Proposal or furnish, or otherwise afford access, to any Person (other than BMBC) any information or data with respect to RBPI or any of its Subsidiaries or otherwise relating to an Acquisition Proposal; (c) release any Person from, waive any provisions of, or fail to enforce any confidentiality agreement or standstill agreement to which RBPI or any of its Subsidiaries is a party; or (d) enter into any agreement, agreement in principle or letter of intent with respect to any Acquisition Proposal or approve or resolve to approve any Acquisition Proposal or any agreement, agreement in principle or letter of intent relating to an Acquisition Proposal. Any violation of the foregoing restrictions by RBPI, any RBPI Subsidiary or any Representative, whether or not such Representative is so authorized and whether or not such Representative is purporting to act on behalf of RBPI or otherwise, shall be deemed to be a breach of this Agreement by RBPI. RBPI and its Subsidiaries shall, and shall cause each of Representative to, immediately cease and cause to be terminated any and all existing discussions, negotiations, and communications with any Persons with respect to any existing or potential Acquisition Proposal.

59. Further, the Company must promptly, and within twenty-four hours, advise Bryn Mawr of any proposals or inquiries received from other parties. Section 6.10.3 of the Merger Agreement states, in relevant part:

> RBPI shall promptly (and in any event within twenty-four (24) hours) notify BMBC in writing if any proposals or offers are received by, any information is requested from, or any negotiations or discussions are sought to be initiated or continued with, RBPI or any RBPI Representatives, in each case in connection with any Acquisition Proposal, and such notice shall indicate the name of the Person initiating such discussions or negotiations or making such proposal, offer or information request and the terms and conditions of any proposals or offers (and, in the case of written materials relating to such proposal, offer, information request, negotiations or discussion, providing copies of such materials (including e-mails or other electronic communications) unless (a) such materials constitute confidential information of the party making such offer or proposal under an effective confidentiality agreement, (b) disclosure of such materials jeopardizes the attorney-client privilege or (c) disclosure of such materials contravenes any law, rule, regulation, order, judgment or decree). RBPI agrees that it shall keep BMBC informed, on a current basis, of the status and terms of any such proposal, offer, information request, negotiations or discussions (including any amendments or modifications to such proposal, offer or request).

60. Moreover, the Merger Agreement contains a highly restrictive "fiduciary out" provision permitting the Board to withdraw its approval of the Proposed Transaction under extremely limited circumstances, and grants Bryn Mawr a "matching right" with respect to any Acquisition Proposal made to the Company. Section 6.10.5 of the Merger Agreement provides, in relevant part:

> Notwithstanding Section 6.10.4, prior to the date of RBPI Shareholders Meeting, the Board of Directors of RBPI may make an RBPI Subsequent Determination after the third (3rd) Business Day following BMBC's receipt of a notice (the "**Notice of Superior Proposal**") from RBPI advising BMBC that the Board of Directors of RBPI has decided that a bona fide unsolicited written Acquisition Proposal that it received (that did not result from a breach of this Section 6.10) constitutes a Superior Proposal (it being understood that RBPI shall be required to deliver a new Notice of Superior Proposal in respect of any revised Superior Proposal from such third party or its affiliates that RBPI proposes to accept and the subsequent notice period shall be two (2) Business Days) if, but only if, (a) the Board of Directors of RBPI has reasonably determined in good faith, after consultation with and having considered the advice of outside legal counsel and a financial advisor, that the failure to take such actions would be reasonably likely to violate its fiduciary duties under applicable Law, and (b) at the end of such three (3) Business Day period or the two (2) Business Day period (as the case may be), after taking into account any such adjusted, modified or amended terms as may have been committed to in writing by BMBC since its receipt of such Notice of Superior Proposal (_provided, however_, that BMBC shall not have any obligation to propose any adjustments, modifications or amendments to the terms and conditions of this Agreement), the Board of Directors of RBPI has again in good faith made the determination (i) in clause (a) of this Section 6.10.5 and (ii) that such Acquisition Proposal constitutes a Superior Proposal. Notwithstanding the foregoing, the changing, qualifying or modifying of the RBPI Recommendation or the making of a RBPI Subsequent Determination by the Board of Directors of RBPI shall not change the approval of the Board of Directors of RBPI for purposes of causing any applicable federal or state anti-takeover laws or regulations to be inapplicable to this Agreement and the RBPI Voting Agreements and the transactions contemplated hereby and thereby, including the Merger.

61. Further locking up control of the Company in favor of Bryn Mawr, the Merger Agreement provides for a "termination fee" of $5 million, or approximately 4% of the Proposed Transaction's value, payable by the Company to Bryn Mawr.

62. By agreeing to all of the deal protection devices, the Individual Defendants have locked up the Proposed Transaction and have precluded other bidders from making successful competing offers for the Company.

63. The consideration to be paid to plaintiff and the Class in the Proposed Transaction is unfair and inadequate because, among other things, the intrinsic value of the Company is materially in excess of the amount offered in the Proposed Transaction.

64. Furthermore, the Proposed Transaction consideration fails to adequately compensate the Company's stockholders for the significant synergies created by the merger.

65. Accordingly, the Proposed Transaction will deny Class members their right to share proportionately and equitably in the true value of the Company's valuable and profitable business, and future growth in profits and earnings.

### *The Registration Statement Omits Material Information, Rendering It False and Misleading*

66. Defendants filed the Registration Statement with the SEC in connection with the Proposed Transaction. As discussed below and elsewhere herein, the Registration Statement omits material information that must be disclosed to Royal Bancshares's stockholders to enable them to render an informed decision with respect to the Proposed Transaction.

67. *First*, the Registration Statement omits material information regarding RBPI's financial projections. The disclosure of projected financial information is material because it provides stockholders with a basis to project the future financial performance of a company, and allows stockholders to better understand the financial analyses performed by the company's financial advisor in support of its fairness opinion.

68. For example, the Registration Statement states that, in connection with Sandler O'Neill's fairness opinion and valuation analyses (including its Net Present Value and Pro